**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TIFFANY KESSLING, DDS,** | ) | Case No. 2:20-cv-1719 |
| | ) | |
| Plaintiff, | ) | Judge _____ |
| | ) | |
| v. | ) | |
| | ) | |
| **OHIO STATE UNIVERSITY,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **PATRICK LLOYD, Personally and in His** | ) | |
| **Official Capacity as Dean of Ohio State University** | ) | |
| **College of Dentistry,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **PETER LARSEN, Personally and in His** | ) | |
| **Official Capacity as Chair of Ohio State University** | ) | |
| **Division of Oral and Maxillofacial Surgery** | ) | |
| **and Anesthesiology,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MEADE VAN PUTTEN, JR., Personally and in His** | ) | |
| **Official Capacity as Ohio State University** | ) | |
| **Professor of Maxillofacial Prosthodontics,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MATTHEW OLD, Personally and in His Official** | ) | |
| **Capacity as Ohio State University James Cancer** | ) | |
| **Center Director of Head and Neck Oncologic Surgery** | ) | |
| **and Head and Neck Service Line,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **TINA SOWERS, Personally and in Her Official** | ) | |
| **Capacity as Ohio State University James Cancer** | ) | |
| **Center Head and Neck Service Line Administrator,** | ) | |
| | ) | |
| Defendants. | ) | |

1

**COMPLAINT WITH JURY DEMAND**

**I.      INTRODUCTION**

1.      This is an action for compensatory and punitive damages as well as injunctive relief arising from a series of acts of sex and pregnancy discrimination and retaliation by Defendants Ohio State University, Dean of the College of Dentistry Patrick Lloyd, Oral and Maxillofacial Surgery Department Chair Peter Larsen, former Director of Maxillofacial Prosthodontics Meade van Putten, Head and Neck Service Line and Head and Neck Oncologic Surgery Director Matthew Old, and Head and Neck Service Line Administrator Tina Sowers, in violation of Title VII of the Civil Rights Act of 1964, as amended, Title IX of the Education Amendments of 1972, the First and Fourteenth Amendments to the United States Constitution, and 42 United States Code Sections 1981 and 1983.

Defendant van Putten subjected the Plaintiff, Tiffany Kessling, DDS, a former Ohio State University clinical dental faculty member and a practicing dentist for the Ohio State University James Cancer Center, to a discriminatory and retaliatory hostile working environment.  Dr. Kessling and other female employees in the College of Dentistry and the James Cancer Center complained about Defendant van Putten's conduct.  But instead of holding Defendant van Putten accountable, the Defendants retaliated against Dr. Kessling.  Over a period of more than a year and a half, the Defendants interfered with Dr. Kessling's work, denigrated her performance, refused to pay her commensurate with her experience and skills, and prevented her from obtaining critically important credentials and board certification as a specialist in her field.  This pattern of discrimination and retaliation culminated in Dr. Kessling's constructive discharge and the destruction of her career path in her chosen field.

2

## II. JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over the Plaintiffs' claims pursuant to Title 28 U.S.C. Section 1331, this being an action pursuant to 42 U.S.C. Sections 1981, 1983, and 2000e, 20 U.S.C. Sections 1681–1688, and the United States Constitution.

3. At all relevant times, the parties resided and conducted business, and the events herein took place, in Franklin County, within the Southern District of Ohio, Eastern Division.

## III. PARTIES

4. Defendant Ohio State University (hereinafter "OSU" or "the University") is a public university and a political subdivision of the State of Ohio. It is an employer for purposes of Title VII of the Civil Rights Act of 1964, as amended, with over 40,000 employees. Among many other divisions, the University operates the Ohio State University College of Dentistry ("the College") and the Ohio State University James Cancer Center ("the James").

5. Defendant Patrick Lloyd is the dean of the OSU College of Dentistry. He has authority to make and execute university academic and clinical policy affecting the faculty and staff of the College, including the Plaintiff at all relevant times. Defendant Lloyd is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal and official capacities.

6. Defendant Peter Larsen is Chair of the OSU College of Dentistry's Division of Oral and Maxillofacial Surgery and Anesthesiology. He serves as the principal point of contact and policy-maker for the College regarding hospital privileges and credentialing of dental faculty with duties at the James Cancer Center, including the Plaintiff at all relevant times. Defendant Larsen is an Ohio resident who lives and works within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal and official capacities.

7. Defendant Meade van Putten, Jr., is the senior clinical faculty member in the clinic in which the Plaintiff worked at all relevant times. He was OSU's Director of Maxillofacial Prosthodontics from the beginning of the Plaintiff's employment until June 2019. Defendant van Putten is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal and official capacities.

8. Defendant Matthew Old is the Director of Head and Neck Oncologic Surgery and the Head and Neck Service Line at the James Cancer Center, which is the division and service line in which the Plaintiff worked at all relevant times. He is principally responsible for making policy regarding the operations of the James Cancer Center clinic in which the Plaintiff worked, including assignment of procedures and professional staffing. Defendant Old is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal and official capacities.

9. Defendant Tina Sowers is the James Cancer Center Head and Neck Service Line Administrator. With Defendant Old, she is responsible for making and executing policy as to the operations of the clinic in which the Plaintiff worked, including scheduling, support staffing, and assignments. Defendant Sowers lives and works within the jurisdiction of the Southern District of Ohio, Eastern Division. She is sued in her personal and official capacities.

10. Plaintiff Tiffany Kessling, DDS, is a female resident of Delaware County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division.

11. The actions of the Defendants and their agents and employees, which were within the scope of their employment, were at all relevant times undertaken, in concert with each other, because of intentional discrimination and retaliation and conducted with malice and knowing disregard for the Plaintiff's rights under clearly established federal law.

**IV. FACTS**

*The Plaintiff Is Hired at OSU But Subjected to a Double Standard Compared to Her Male Peer, Defendant van Putten*

12. Plaintiff Tiffany Kessling, DDS, was hired by Defendant OSU in the summer of 2014 as a faculty member in the College of Dentistry's division of restorative and prosthodontic dentistry and a clinician at the OSU Wexner Medical Center and James Cancer Center. She served in that role until December 2019.

13. Dr. Kessling is a highly trained and accomplished practitioner in general dentistry and maxillofacial prosthodontics, which involves prosthetic reconstructive treatment related to the teeth and jaws. She completed residencies in general practice at OSU's Medical Center and in prosthodontics at the University of Pittsburgh and a prestigious fellowship in maxillofacial prosthetics and oral oncology at the University of Texas MD Anderson Cancer Center.

14. Dr. Kessling's training was ideally tailored to the work she was hired to perform at OSU, which primarily involved prosthodontics and maxillofacial procedures (those involving the face and jaws) for patients undergoing cancer treatment at the James Cancer Center.

15. Dr. Kessling's qualifications and the high quality of her work were recognized with consistently positive performance reviews, student evaluations, and multiple awards for patient care. But despite her exceptional performance, Dr. Kessling was consistently subjected to a double standard compared to Defendant Meade van Putten, her senior male colleague. Defendant van Putten was paid over a hundred thousand dollars more per year than Dr. Kessling at all relevant times to do the same work Dr. Kessling did. It was expected that Defendant van Putten would be paid at a higher rate due to his greater experience, but the massive degree of the pay difference was not warranted by either their skill, experience, or actual performance.

5

16. In addition to the pay disparity, Defendant van Putten was given a more favorable schedule, including a full-time schedule at the James Cancer Center with no dedicated time performing College of Dentistry functions. It was always more favorable for the clinical faculty members to maximize such hospital time and minimize College-based duties. This was particularly true for Dr. Kessling, who needed to develop her skills performing prosthodontic procedures to be board certified as a prosthodontic specialist and to pursue her chosen specialty of maxillofacial prosthodontics. Defendant Lloyd and the other Defendants were well aware of Dr. Kessling's need and desire to maximize her dedicated hospital time and repeatedly promised to provide her a five-days-a-week hospital schedule like Defendant van Putten's, but she was never given more than four hospital days per week.

17. Besides having a more favorable schedule, Defendant van Putten, unlike Dr. Kessling, was consistently allowed to reject patient procedures (and even entire types of procedures) he preferred not to perform—which forced Dr. Kessling to take them on in his place.

*The Plaintiff Participates in an Investigation of Defendant van Putten and Opposes His Discriminatory Conduct*

18. Defendant van Putten was also actively hostile to Dr. Kessling and other female employees at OSU, especially from approximately 2016 forward. His demeanor was dismissive when he was calm, and he had uncontrolled fits of temper, nearly always directed at female colleagues and subordinates, including Dr. Kessling.

19. Dr. Kessling gave birth to three children during her time at OSU. When she took maternity leave for the birth of her second child, Defendant van Putten complained angrily about the added schedule burden it caused him, to the point that Dr. Kessling was afraid to tell him when she was expecting her third child in 2018.

6

20. In January and February 2018, Defendant van Putten's anger and treatment of women progressively worsened, to the point that, on or about February 14 and 19, 2018, multiple nurses and dental assistants filed formal internal complaints of workplace violence and discrimination against him. This resulted directly from unprovoked outbursts in which van Putten became enraged when a female staff member called him by his first name, because a technological change was implemented in the clinic, and for other objectively trivial reasons.

21. OSU's Human Resources office conducted an investigation of Defendant van Putten's conduct for several weeks in February and March 2018, interviewing a number of witnesses, including Dr. Kessling.

22. In her interview and follow-up communications, Dr. Kessling confirmed that she had observed firsthand and heard of multiple incidents of inappropriate and uncontrolled behavior by Defendant van Putten toward female subordinates and toward herself. She reported that van Putten had been repeatedly heard to say that when the College hired a new clinician (which it had been in the process of doing at the time), it should not be a woman because of the risk that a female dentist would become pregnant and miss work. A female clinician was ultimately hired in early 2018, but only after the position had been offered to multiple male candidates. Dr. Kessling also confirmed to the investigator that she was pregnant, but that she feared informing van Putten because of his anger at her previous pregnancy.

23. In addition to her complaints about Defendant van Putten, Dr. Kessling told the investigator that Defendant Sowers was complicit in van Putten's behavior and was active in defending him, giving him preferential treatment, and refusing to assist Dr. Kessling with concerns she had previously raised about his discriminatory and hostile conduct. Dr. Kessling also informed the investigator of the massive pay disparity described above.

24. OSU Human Resources issued a report on March 23, 2018, finding that Defendant van Putten had "engaged in inappropriate behavior" as to harassment on the basis of gender and OSU's workplace violence policy. This included van Putten's comments to a search committee that they should hire a man instead of a woman to avoid the need to provide maternity leave (which he had admitted making), and his outbursts, which were "intentional, inappropriate for the workplace, and exacerbated the strained relationship" with other employees.

25. The OSU Human Resources report did not name Dr. Kessling, but it made her identity as a complaining witness against Defendant van Putten obvious using references to her position and history of pregnancies and maternity leave.

*The Defendants Punish the Plaintiff Instead of van Putten in Response to the Report*

26. Despite the findings in the report, no one within the College of Dentistry or the James Cancer Center took any significant action to address Defendant van Putten's misconduct.

27. Instead of imposing consequences on Defendant van Putten for his discriminatory conduct, the College and James Cancer Center administrations took action to retaliate against Dr. Kessling. They also retaliated against others who had complained about Defendant van Putten, including removing all of the nursing staff from the James Cancer Center clinic.

28. In April 2018, Defendant Lloyd met with Dr. Kessling. In this meeting, he told her he was disappointed that she had aired complaints to Human Resources. He told her that her complaints were disturbing the relationship between the College and the James Cancer Center, and that he had "too much invested" in that relationship for her to interfere with it. He specifically warned her that he had the power to revoke her College appointment, which would also result in the loss of her hospital position, which was contingent on her College appointment.

29. In the same meeting, for the first time, Defendant Lloyd claimed Dr. Kessling was doing too many oral surgeries and that she must immediately stop performing tooth extractions.

30. Tooth extractions are necessary for cancer patients undergoing radiation therapies. Because other practitioners were refusing to perform extractions due to scheduling and payment issues, patients at the James had been delayed in receiving radiation treatment, even to the point of affecting their prognosis for recovery or survival. Accordingly, at colleagues' request, Dr. Kessling had been performing some extractions on her own time, outside of and in addition to her regular clinic hours, to help patients whose cancer treatments would otherwise be delayed. This work had never been criticized before she participated in the van Putten investigation.

31. Defendant Lloyd further instructed Dr. Kessling not to tell anyone she had been told to stop performing extractions, which would have jeopardized her relationships with oncologists at the James by making her refusal to assist appear to be her personal choice.

32. Similarly, Defendant Lloyd claimed in the same April 2018 meeting that he had received multiple complaints about Dr. Kessling's communication and level of preparation, and that she had received poor training that led to these deficiencies. These allegations were simply false. They included allegations that she had failed to perform certain preparation functions, such as the fabrication of surgical guides, that were not even part of contemporary practice at OSU (but had been required during the time Defendant Lloyd was in active practice).

33. Defendant Lloyd's complaints about Dr. Kessling's tooth extractions and her communications and preparation were not legitimate, but were invented and exaggerated in order to punish and retaliate against her for her opposition to sex and pregnancy discrimination and deter and intimidate her from raising further similar concerns.

34. Defendants van Putten and Sowers also immediately began to retaliate against Dr. Kessling at the James clinic. Van Putten and Sowers authorized the reorganization of Dr. Kessling's personal workspace and the removal of equipment without consulting her. Van Putten essentially stopped communicating with Dr. Kessling altogether, even when she directly addressed him—for example, even going so far as responding to a question from Dr. Kessling by instructing a nearby male staff member to relay the answer to her question.

35. The pattern of retaliation worsened considerably after Dr. Kessling gave birth in June 2018 and took maternity leave.

36. While Dr. Kessling was on leave, in August 2018, the Defendants rewrote her contract to alter her schedule by cutting her hospital days from four to only two. Defendants Lloyd, Sowers, and others openly discussed with each other that they would rationalize Dr. Kessling's reduced schedule using the excuse of changes to James Cancer Center clinic staffing, but that the real reason was about "behavioral" and "team dynamic" issues. No behavioral or teamwork issues had ever been raised to Dr. Kessling except through Defendant Lloyd's criticisms of her participation in the discrimination investigation of Defendant van Putten.

37. In contrast to the reduction for Dr. Kessling, Defendant van Putten maintained his full-time hospital schedule, despite behavioral issues that had resulted in formal findings in the Human Resources investigation. Defendant van Putten also received written praise in his annual review and a larger percentage of annual raise than Dr. Kessling.

38. In addition, the clinic's newest practitioner, a female dentist hired in 2018 with no post-fellowship experience, was given four hospital days. Despite the new dentist's inferior experience and lower productivity expectations, her starting annual salary was significantly higher than the salary Dr. Kessling was earning after four years at OSU.

39.     The Defendants also retaliated against Dr. Kessling with respect to her hospital privileges and credentials.  Throughout her time at OSU, Dr. Kessling had sought assistance in obtaining the time and logistical support she needed to obtain prosthodontic board certification, knowing her hospital privileges required certification within five years.  Defendant Lloyd and others assured her that help would be provided, and that extensions were a routine matter.  Defendant van Putten had been excused from the requirement and has never been board certified.

40.     When Dr. Kessling raised concerns about her reduced hospital time and disadvantageous contract, the Defendants responded by criticizing her lack of board certification progress, and for the first time, suggested that an extension of the certification requirement might not be granted.  This pattern of refusing support for Dr. Kessling's board work and then using it to challenge her credentialing status continued until, along with the other retaliatory acts described above and below, it ultimately led to her resignation.

41.     Meanwhile, the College's new dentist in Dr. Kessling's clinic and a newly hired male practitioner in a different clinic were both immediately granted the specially reserved board work time and logistical support Dr. Kessling had been denied.

42.     Similarly, Dr. Kessling had been seeking training to be credentialed in laser-assisted procedures, but had not been able to obtain it due to funding and scheduling issues at the James clinic, which Defendant Sowers never addressed.  But upon her return from maternity leave, Defendants Sowers and Old suddenly insisted Dr. Kessling needed to be laser-certified by the end of December 2018.  Despite continuing to experience mistreatment from Defendant van Putten, Dr. Kessling was instructed to obtain laser training from him, with no other guidance provided.  Defendant Sowers arranged a specific training and shadowing regimen for the new practitioner to facilitate her laser certification, but failed to do the same for Dr. Kessling.

43. Defendant Van Putten refused to cooperate in providing Dr. Kessling the necessary laser training by the end of December. Defendants Sowers and Old blamed Dr. Kessling for this, despite knowing Defendant van Putten was responsible, and attempted to have Dr. Kessling's salary cut or her position revoked due to her lack of laser certification. This was only prevented when Dr. Kessling discovered and reported the special laser certification assistance that had been given to her more junior peer but not to her.

44. Under the pressure of Dr. Kessling's continuing complaints of unequal treatment and retaliation, including complaints through her legal counsel, the Defendants agreed in the fall of 2018 to restore one of the two hospital assignment days that had been taken from Dr. Kessling. But rather than making the assignments equal, the result was for the two female practitioners in the clinic to have three hospital days each, while Defendant van Putten retained all five days of hospital assignment. Both of the other practitioners were also provided more free administrative time than Dr. Kessling in their schedules to complete paperwork and other tasks.

45. Even after this purported compromise, Defendant Sowers, with support from Defendant Old, continued retaliating against Dr. Kessling in designing the new clinic schedule. The new schedule deliberately assigned Dr. Kessling more of the most time-consuming cases, "new dental clearances," than her two fellow practitioners combined—and more of these cases than the clinic was ever actually able to schedule. The result was to overload Dr. Kessling's schedule on certain days, causing excessive wait times for patients and burdens for Dr. Kessling and the clinic's support staff. On other days, because there were no new dental clearance patients to fill these mandatory slots in her schedule, Dr. Kessling's clinic time was wasted, and the total number of procedures she performed relative to her peers was artificially reduced.

46. Dr. Kessling informed Defendants Sowers and Old of the overloading of her schedule with unnecessary new dental clearance slots, including the data supporting her concerns, but they refused to address the issue. Instead, Defendant Sowers attempted to pressure Dr. Kessling to perform new dental clearances more quickly, even after Dr. Kessling explained that doing so would jeopardize the safety of her patients and her own licensure.

47. Defendants Sowers and Old also sought other ways to undermine and pressure Dr. Kessling. This included blaming her for patient complaints and communication lapses that actually resulted from Defendant van Putten's refusal to treat certain patients. Sowers and Old forwarded these complaints to College and hospital officials, harming Dr. Kessling's reputation.

48. Defendant Lloyd also joined in this effort to criticize Dr. Kessling's clinical performance. In one meeting, Defendant van Putten disparaged Dr. Kessling's performance of facial prosthetic procedures. He withdrew this accusation only when Dr. Kessling pointed out that he had never actually observed her work in this regard. Defendant Van Putten was not subjected to any criticism or discipline for his false accusation. Instead, following the meeting, Defendant Lloyd encouraged Defendant van Putten to continue forwarding complaints about Dr. Kessling directly to his attention so he could act on them.

49. Meanwhile, throughout this period, the Defendants were continuing to employ a double standard favoring Dr. Kessling's fellow practitioners. With the support and encouragement of Defendant Old, Defendant van Putten and the clinic's new practitioner were continuing to perform oral surgery procedures, including tooth extractions, without limitations, while Dr. Kessling continued to be banned from doing so.

50. The other practitioners were also given scheduling flexibility that was not available to Dr. Kessling, and were even permitted to schedule procedures in the clinic's limited

treatment rooms at times reserved for Dr. Kessling's patients.  This practice, which occurred without prior notice and on days when Dr. Kessling already had patients scheduled for the same space, interfered with Dr. Kessling's patient care responsibilities, causing severe delays and rescheduling that impacted Dr. Kessling's patients and her reputation for patient care.  Dr. Kessling raised these issues repeatedly to Defendants Sowers, Old, and Lloyd, but they consistently refused to assist her or even respond to her complaints.

51. The Defendants also continued to retaliate against Dr. Kessling using the hospital credentialing process.  Administrative support that had previously been provided by the hospital was withheld, and the routine extension of Dr. Kessling's board certification requirement she was previously assured of was not provided.  Dr. Kessling demonstrated that a three- to four-year extension was needed due to her three pregnancies and the lack of support for her board work.

52. In response, the Defendants promised that an extension of three years would be recommended and likely approved by the credentialing committee, but only if Dr. Kessling registered to take the written examination portion of the board certification process.  The certification rules did not require the written exam to be taken at any particular time, and it was the practical, patient-based portion of the process, not the written exam, that Dr. Kessling had been denied assistance in completing.  Dr. Kessling had held off from taking the exam because doing so (unlike beginning the patient-based work) would trigger an irrevocable deadline for completing the certification process. Taking the written exam in advance of identifying patients posed an unreasonable risk in light of the difficulty of identifying appropriate patients for the patient-based portion of the certification process, the length of time it takes to treat those patients, and the lack of support she had been provided, unlike her peers, in identifying patients

14

and completing her work. At the Defendants' insistence, Dr. Kessling nevertheless registered to take the exam, which she subsequently completed and passed.

53. Defendant Larsen, who was responsible for recommending an extension of Dr. Kessling's board certification requirement for credentialing purposes, was aware of the promise to recommend an extension and the reasons for the promise, including her unequal scheduling treatment and lack of board certification assistance. Instead of assisting Dr. Kessling, Defendant Larsen joined in the effort to discriminate and retaliate against her. Despite Dr. Kessling's repeated requests in 2018, she was not provided with the paperwork needed to request the extension until after the February 2019 credentialing deadline. Defendant Larsen then blamed Dr. Kessling for failing to complete paperwork she had never received and falsely claimed he was unaware of the promise to recommend a three-year extension.

54. As a result of Defendant Larsen's interference and refusal to fulfill the Defendants' promise to recommend a three-year extension, the hospital provided only a six-month extension of Dr. Kessling's credentials, placing her employment status in limbo.

55. As the six-month deadline approached, Dr. Kessling repeatedly sought information from Defendant Larsen about her credentialing status, and what more she needed to do, beyond the quality patient care she continued to provide and the significant progress she had made toward her board certification, to obtain a renewal of her credentials. Defendant Larsen refused to provide any information in response. The natural and predictable effect of this was to completely deprive Dr. Kessling of her job security.

56. Finally, on or about November 17, 2019, facing continued attacks on her job security and patient care responsibilities, Dr. Kessling was forced to submit her resignation, effective December 2, 2019, and to accept a position outside of OSU that was inferior in its

scope of practice and made it impossible to continue progress toward her board certification or pursue her chosen specialty in maxillofacial prosthodontics. OSU is the only central Ohio institution where Dr. Kessling's specialty is practiced, and she must work at a public entity for several more years to obtain necessary loan repayment assistance. She therefore had no intention of leaving OSU and would not have done so in the absence of the discrimination and retaliation that made her work environment intolerable and effectively ended her chosen career path.

57. The actions of the Defendants described herein were undertaken with malice and knowing and reckless disregard for the Plaintiff's statutory and constitutional rights.

58. The actions of the Defendants have caused the Plaintiff loss of income, reputational damages, anxiety, anger, humiliation, embarrassment, and stress.

59. The Plaintiff has exhausted all required administrative remedies for purposes of Title VII of the Civil Rights Act of 1964, as amended. She filed a timely dual charge with the Ohio Civil Rights Commission and Equal Employment Opportunity Commission on February 27, 2019, alleging an ongoing discriminatory and retaliatory hostile work environment. A notice of right to sue, which is attached as Exhibit 1 to this Complaint, was issued on December 30, 2019, sent by regular mail, and received by the Plaintiff on January 6, 2020.

## V. FEDERAL CLAIMS FOR RELIEF

### A. DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII

60. The preceding paragraphs are hereby incorporated and re-alleged.

61. The sex and pregnancy discrimination against the Plaintiff by Defendant Ohio State University, as well as its retaliation against the Plaintiff for her opposition to discrimination and her participation in investigations related to discrimination, violated Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. Section 2000e *et seq.*).

### B.     DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE IX

62.     The preceding paragraphs are hereby incorporated and re-alleged.

63.     The discrimination and retaliation against the Plaintiff by Defendant Ohio State University constituted sex discrimination by a federally funded educational institution and therefore violated Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681 *et seq.*).

### C.     DISCRIMINATION AND RETALIATION IN VIOLATION OF THE UNITED STATES CONSTITUTION

64.     The preceding paragraphs are hereby incorporated and re-alleged.

65.     By discriminating against the Plaintiff in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and by discriminating and retaliating against the Plaintiff in response to her speech on a matter of great public concern and for raising equal protection concerns, the actions of Defendants Lloyd, Larsen, van Putten, and Sowers, in their personal and official capacities, violated the First and Fourteenth Amendments to the United States Constitution, which are actionable pursuant to Title 42 U.S.C. Section 1983.

## VI.    PRAYER FOR RELIEF

66.     **Wherefore,** the Plaintiff asks for judgment against the Defendants and requests:

(A)     Compensatory and punitive damages in the amount of $800,000.00;

(B)     An order reinstating the Plaintiff to her former employment with OSU and directing that she be paid commensurate with her experience and responsibilities;

(C)     The costs of this action, including reasonable attorney's fees;

(D)     Pre- and post-judgment interest and compensation for the tax consequences of the delayed payment of the Plaintiff's compensation; and

(E)     Any other relief deemed appropriate by the Court.

17

Respectfully Submitted,

/s/Frederick M. Gittes_____
Frederick M. Gittes (0031444)
fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
jvardaro@gitteslaw.com
The Gittes Law Group
723 Oak St.
Columbus, OH 43205
Phone: (614) 222-4735
Fax: (614) 221-9655
Attorneys for the Plaintiff

# JURY DEMAND

The Plaintiffs hereby demand a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Frederick M. Gittes_____
Frederick M. Gittes (0031444)