## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**TIFFANY KESSLING, DDS,**

        **Plaintiff,**

                          **:**

    **v.**                          **Case No. 2:20-cv-1719**

                                  **Judge Sarah D. Morrison**

**OHIO STATE UNIVERSITY, *et***      **Magistrate Judge Chelsey M.**
***al.*,**                            **Vascura**

                          **:**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on two motions. First, Defendant Ohio State University filed a Motion for Summary Judgment on behalf of all defendants (ECF No. 51), to which Plaintiff Tiffany Kessling responded[1] (ECF No. 61), and the University replied (ECF No. 68). Kessling then moved to strike new arguments raised in the University's reply and requested leave to file a sur-reply. (ECF No. 69.) The University responded to that motion (ECF No. 70), and Kessling has replied (ECF No. 71). Both motions are now ripe for consideration.

For the reasons set forth below, the Plaintiff's Motion to Strike is **DENIED** and the Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

_____

[1] Dr. Kessling requested oral argument in her response. Because the Court does not believe additional argument would be helpful, that request is **DENIED**.

## I.     STATEMENT OF ESSENTIAL FACTS

The factual record in this case is voluminous, encompassing more than 200 pages of argument from the attorneys and over 5,000 pages of discovery, including 14 depositions and 75 exhibits. While the briefs themselves are very repetitive, Dr. Kessling asserts that she experienced a "campaign" of retaliation and discrimination that included 20 distinct adverse employment actions before she was constructively discharged. On the other hand, OSU tells the story of a doctor who did not get along with her colleagues and was habitually behind in obtaining requisite professional certifications before she voluntarily left the University for a higher paying job.

There are multiple people involved in this case, either as an individual defendant or as a witness. Those people include:

| Name | Status | Role |
|---|---|---|
| Patrick Lloyd | Defendant | Dean of the College of Dentistry and Kessling's indirect supervisor. |
| Matthew Old | Defendant | Medical Director of Head and Neck Cancer Service Line, which includes the Maxillofacial Prosthodontic Clinic, within the James Clinic at the Wexner Medical Center. |
| Meade Van Putten | Defendant | A maxillofacial prosthodontist at the College of Dentistry. |
| Tina Sowers | Defendant | Service Line Administrator for the Maxillofacial Prosthodontic Clinic at the James Clinic. |
| Peter Larson | Defendant | Chief of Clinical Services at the College of Dentistry. |

2

| Lisa Lang | Witness | Kessling's direct supervisor at the College of Dentistry. |
| Sasha Valentin | Witness | A maxillofacial prosthodontist at the College of Dentistry. |
| Daniel Cortes | Witness | A general prosthodontist at the College of Dentistry. |
| Sarah Coyan | Witness | Service Line and scheduling administrator at the James. |
| Kristi Hoge | Witness | Investigator for OSU's Human Resources Department. |

Dr. Kessling is a maxillofacial prosthodontist employed by the University's College of Dentistry[2] from July 2014 until December 2019. Prior to her appointment as a full-time faculty member, the University provided Kessling with a fellowship grant to obtain more training in her specialty. (Lloyd Dep., ECF No. 43-1, PAGEID # 2866; Kessling Personnel File, ECF No. 51-1, PAGEID # 5097.) Upon completion of her fellowship, Kessling was appointed as associated faculty with an initial base salary of $105,000. (Kessling Personnel File, ECF No. 51-1, PAGEID # 5094.) However, after Drs. Lloyd and Van Putten advocated for a greater starting salary, her initial base salary was increased to $160,000. (Kessling Personnel File, ECF No. 51-1, PAGEID # 5076.) She was reappointed annually to that associated faculty position and was offered a clinical-track faculty position in 2018.

---

[2] OSU is a governmental unit of the State of Ohio.

Although she was not eligible for annual merit-based raises, Kessling received annual salary increases of 1.7% in 2015, 1.75% in 2016, 1.6% in 2017, and 2% in 2018. (Kessling Personnel File, ECF No. 51-1, PAGEID # 5073–74, 5083; Lang Dep., ECF No. 45-3, PAGEID # 3910–13.) Kessling's final annual salary at OSU was $171,600.

Two other maxillofacial prosthodontists were employed by the College of Dentistry during Kessling's employment—Dr. Van Putten and Dr. Valentin. Van Putten was a tenured faculty member with over 30 years at the University. Among other things, as tenured faculty, Van Putten was eligible for merit-based raises and during Kessling's employment, Van Putten received annual salary increases of 1.5% in 2015, 1.8% in 2016, 1.9% in 2017, and 2.2% in 2018. (Van Putten Personnel File, ECF No. 51-3, PAGEID # 5138–40, 5164; Lang Dep., ECF No. 45-3, PAGEID # 3911–13.) His base salary at the time of Kessling's resignation was $282,688.

Valentin was appointed as clinical-track faculty in February 2018 with a base salary of $180,000. (Valentin Personnel File, ECF No. 51-2.) Valentin did not receive any raises during Kessling's employment but was eligible for merit-based raises as clinical faculty.

All three maxillofacial prosthodontists split their time between the College and the James. The allocation of each maxillofacial prosthodontist's duties was determined, at least in part, by the terms of their respective contracts and the College's service level agreement with the James. (Kessling Personnel File, ECF No. 51-1, PAGEID # 5109; Valentin Contract, ECF No. 51-21; Service Level Agreement,

ECF No. 51-22.) Any changes to the allocation of work had to be approved by Dr. Lloyd and officials at the James. (Sowers Dep., ECF No. 42-2, PAGEID # 2304–06.)

Within the College, the day-to-day distribution of the maxillofacial prosthodontists' clinical and teaching responsibilities was determined by Drs. Lang and Lloyd. (Lang Dep., ECF No. 45-2, PAGEID # 3830–32.) Within the James, the distribution of clinical, lab, and administrative duties were laid out in scheduling templates that were administered by scheduling teams. (Sowers Dep., ECF No. 42-2, PAGEID # 2202, 2353–55; Coyan Dep., ECF No. 37-2. PAGEID # 760–62.) According to Dr. Kessling, the process of creating scheduling templates was overseen by Tina Sowers. (Kessling Decl., ECF No. 61-2, PAGEID # 6025.) The maxillofacial prosthodontists were involved in setting their own templates according to patient care and clinical needs. (Sowers Dep., ECF No. 42-2, PAGEID # 2354–55.)

The maxillofacial prosthodontists were required to maintain credentials at both the College and the James. Relevant here, credentialling at the James required board certification or a valid waiver of that requirement. When first hired, Kessling and Valentin were each given initial five-year waivers. Van Putten was grandfathered out of the board certification requirement. (Larsen Dep., ECF No. 40-2, PAGEID # 1522, 1533–34.)

**Kessling's complaints about her treatment at the University.**

As Kessling tells it, over the entire five years that she was at the University, she "experienced a pattern of sex and pregnancy discrimination and retaliation."

5

(Resp., PAGEID # 5828.) She complains that her mistreatment started from the beginning with her starting salary and that it "worsened over the course of time" after she took her second and third pregnancy and maternity leave in 2016 and 2018 and after her participation in two internal investigations in 2018. (*Id.* at 5829.)

On March 2, 2018, Kessling was interviewed as part of an investigation into a nurse's complaint of workplace violence and sex discrimination by Dr. Van Putten. During her interview, Kessling complained to Ms. Hoge that Van Putten pressured her to take a shorter maternity leave and that he requested that a man or woman of non-childbearing age be hired as the third maxillofacial prosthodontist (the position for which Dr. Valentin was ultimately hired). (Hoge Dep., ECF No. 46-3, PAGEID # 4492–95.) During that interview, Kessling also complained about sex-based pay disparities.

On November 19, 2018, she was interviewed related to a faculty member's complaint of pregnancy discrimination by Dr. Lloyd. OSU disputes that she made any complaints of her own at that time, but Dr. Kessling says that she reiterated her concerns about pay disparities and complained that Lloyd retaliated against her for her participation in the earlier investigation. (Kessling Dep., ECF No. 39-1, PAGEID # 1349–53; Hoge Dep., ECF No. 46-8, PAGEID # 4773–80.)

**Kessling's 2018–19 contract.**

From June to August 2018, Kessling was on her third maternity leave. (Kessling Dep., ECF No. 38-1, PAGEID # 965.) During her leave, Kessling was

6

offered a new contract that included an appointment to clinical-track faculty, which would have made her eligible for merit-based raises, provided for four-year (rather than annual) contract-renewal periods, and provided her with greater leave accrual. (Kessling Personnel File, ECF No. 51-1, PAGEID # 5109; Lang Dep., ECF No. 45-3, PAGEID # 3910–13.) The new contract also allocated Kessling's duties as 40% at the James and 60% at the College.

Dr. Kessling objected to some of the terms in the new contract[3] but she was not offered an alternative contract. (Kessling Decl., ECF No. 61-2, PAGEID # 6017.) Nevertheless, she continued working at OSU beyond the expiration of her 2018 contract. It is unclear from the record what her official status was after the expiration of her previous contract.

**Kessling applies for a new job and resigns from the University.**

In July 2019, Kessling was invited to apply for a position with the Veterans Health Administration. In response, Kessling did apply but she says that she had no intention of leaving OSU prior to being solicited for the VA job. (Kessling Dep., ECF No. 38-3, PAGEID # 1118–21.) When the VA offered Kessling a position that paid roughly $30,000 more per year than she was paid by OSU, she accepted the

_____

[3] Kessling contends that the allocation set forth in the new contract was a reduction in her duties at the James. However, her prior contract did not include a fixed allocation of her time—though a service level agreement between the James and the University had allocated 80% of her time to the James and, since 2015, she had consistently spent 80% of her time at the James. (Service Level Agreement, ECF No. 51-22.)

offer and resigned from OSU effective December 2, 2019. (Kessling Dep., ECF No. 38-3, PAGEID # 1118.)

## II.    MOTION FOR LEAVE TO FILE SUR-REPLY

A district court has the discretion to deny leave to file a sur-reply where the opposing party's reply did not raise new legal arguments or introduce new evidence. *Modesty v. Shockley*, 434 Fed.Appx. 469, 472 (6th Cir.2011) (citing *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir.2003)). Despite Kessling's arguments to the contrary, Defendants' reply brief did not raise new arguments. Instead, it expounded on arguments raised in the motion for summary judgment or served as counterpoints to arguments raised by Kessling in her response—that is the purpose of a reply brief.

Plaintiff's Motion to Strike and for Leave to File Sur-reply is **DENIED**.

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    Overview of the Claims

Kessling sued the University for unlawful retaliation and sex discrimination under both Title VII (Count I) and Title IX (Count II). She also brought parallel claims against five people, in their individual and official capacities, pursuant to 42 U.S.C. § 1983 for First Amendment retaliation and for equal protection violations under the Fourteenth Amendment (Count III).

For each of Dr. Kessling's claims she alleges that she suffered the following 20 adverse actions:

(1)    Dr. Lloyd threatened to withdraw Dr. Kessling's academic appointment;

(2) Drs. Lloyd and Larsen restricted Dr. Kessling's clinical privileges to extract teeth;

(3) Ms. Sowers and Dr. Van Putten denied Dr. Kessling additional time that she requested in the James Clinic;

(4) Dr. Kessling's time at the James Clinic was cut from four days to two;

(5) Dr. Kessling was reassigned to less favorable duties within the College;

(6) OSU did not renew Dr. Kessling's contract and she was instead offered a less favorable contract;

(7) Defendants did not assist Dr. Kessling with obtaining her board certification;

(8) Dr. Van Putten was disrespectful to Dr. Kessling;

(9) Dr. Lloyd encouraged Dr. Van Putten to make false allegations about Dr. Kessling's competency;

(10) Ms. Sowers collected false information about Dr. Kessling;

(11) Ms. Sowers and Dr. Old demanded that she be removed from the James Clinic;

(12) Ms. Sowers and Dr. Old imposed an arbitrary deadline for her to obtain her laser credentials and failed to give her help;

(13) Ms. Sowers and Dr. Old accused her of misusing a laser on a patient;

(14) Ms. Sowers imposed a punitive scheduling template on her;

(15) Ms. Sowers and Dr. Old attacked her productivity and sought to revoke accommodations given to her for breastfeeding and childcare;

(16) Ms. Sowers and Dr. Old attacked her for mentioning her legal rights in the workplace:

(17) Ms. Sowers and Dr. Old threatened to refer her to the professionalism committee;

(18) Ms. Sowers accused her of dishonesty and unprofessionalism;

(19) Dr. Van Putten downgraded his assessment of Dr. Kessling's clinical skills in her credentialing application and delayed her recertification to perform laser procedures; and

(20) Dr. Larsen interfered with Dr. Kessling's credentialing renewal.

(Resp., PAGEID # 5860–95.)

For her retaliation claims only, Kessling argues that all twenty actions, when considered in aggregate, constituted retaliatory harassment. In addition, for her discrimination claims, Dr. Kessling alleges that she was subject to a pay disparity between she and Van Putten from the time she first arrived at the University and that Van Putten was given more favorable treatment than her in various ways.

9

(ECF No. 1, ¶¶ 15, 16.) Finally, she claims that these actions collectively resulted in her constructive discharge.

The Court will address Dr. Kessling's claims in the order in which she brought them—first analyzing her Title VII claim, then her Title IX claim, and finishing with her claims under § 1983.

### B. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### C.    Title VII Claim

It is illegal for an employer to discriminate based on sex or pregnancy status. "[I]t is now well settled that a claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Boyd v. Harding Academy*, 88 F.3d 410, 413 (6th Cir. 1996). Additionally, Title VII prohibits employers from retaliating against an employee that engages in activities protected under the statute. U.S.C. § 2000e–3(a); *see also Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271 (2009) (speaking out about discrimination during an internal investigation is protected under Title VII).

When the retaliatory or discriminatory conditions are so intolerable that a reasonable person would resign, Title VII offers a separate cause of action for constructive discharge. *Green v. Brennan*, 578 U.S. 547, 559–60 (2016) (clarifying that a constructive discharge is a distinct claim under Title VII, not a theory of liability); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) ("'Unless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress.'") (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)).

11

The analytical frameworks for Dr. Kessling's retaliation and discrimination claims against the University overlap so the Court will discuss those claims together before addressing her constructive discharge claim. The Court will then conclude its Title VII analysis by addressing OSU's *Faragher/Ellerth* defense.

### 1.    Retaliation and Discrimination Claims

A plaintiff can prove unlawful discrimination or retaliation using either direct or circumstantial evidence. Dr. Kessling has direct evidence of retaliation, but she does not have direct evidence of discrimination so the starting point for analyzing that claim is the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

Both claims require her to demonstrate that an adverse employment action was taken against her, so the Court will start with whether or not Dr. Kessling experienced any adverse employment actions. *See Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381–82 (6th Cir. 2002).

### a.    Adverse Employment Actions

To constitute an adverse action for purposes of a discrimination claim, the action must be a materially adverse change to the terms and conditions of employment, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.*" Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012).

In contrast, a retaliatory adverse action is any action "that might well have dissuaded a reasonable worker from making or supporting a claim of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70 (2006) (internal citation and quotation omitted). Because an adverse employment action can occur without a change to the terms and conditions of employment, it encompasses more conduct than a discriminatory adverse action—it is any action that would deter a reasonable employee from engaging in protected conduct under the circumstances. *Id.* For example, "[a]lmost every job category involves some responsibilities and duties that are less desirable than others," and reassignment to such duties could have a deterrent effect on a reasonable employee without materially altering the terms of her employment. *Id.* While an employee's protected activities do not "immunize that employee from petty slights or minor annoyances that often take place at work," *Id.* at 68, a plaintiff's unique circumstances "could show that the adverse action was more disruptive than a mere inconvenience or a mere alteration of job responsibilities." *Threat v. City of Cleveland*, 6 F.4th 672, 679 (6th Cir. 2021) (internal quotations omitted). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington*, 548 U.S. at 69.

For both types of claims, the Court applies an objective test—the conduct "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71.

13

Defendants dispute that Dr. Kessling experienced any adverse actions but pay disparities that are not *de minimis* are adverse employment actions. *See Szeinbach v. Ohio State Univ.*, 493 F. App'x 690, 694 (6th Cir. 2012); *see also White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 795–96 (6th Cir.2004). Her remaining 20 alleged adverse actions require more analysis, so the Court will address them in order.

### Adverse Action #1—Dr. Lloyd threatened to withdraw Dr. Kessling's academic appointment.

Shortly after Kessling's interview in Ms. Hoge's first investigation, Kessling met with Drs. Lang and Lloyd. (Kessling Dep., ECF No. 38-2, PAGEID # 1078–79.) According to Kessling, Dr. Lloyd told her that he was disappointed with the amount of information that she had shared in her interview, that she had not respected a senior faculty member, that her employment was contingent on her academic appointment, and that he could and would revoke that appointment if she failed to adhere to his directives. (Kessling Decl., ECF No. 61-2, PAGEID # 6006–07.) Dr. Lloyd denies making any such statement, but Dr. Lang confirmed he said something to that effect. (Lang Dep., 45-1, PAGEID # 3757–59.)

For purposes of a discrimination claim, actions that are not implemented or are immediately rescinded are not adverse employment actions. *See Scott v. Metropolitan Health Corp.*, 234 Fed.Appx. 341, 348 (6th Cir. 2007) (finding that an action that was rescinded and remedied after two months was not an adverse action) (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir.2004).)

14

Where, as here, Dr. Lloyd's threat to withdraw Kessling's academic appointment was not implemented, she has not suffered an adverse action for her discrimination claim.

In contrast, for purposes of a retaliation claim, "threats alone can constitute an adverse action if the threat is capable of deterring a person of ordinary firmness from engaging in protected conduct." *Kubala v. Smith*, 984 F.3d 1132, 1140 (6th Cir. 2021) (quoting *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010)). In particular, "a credible threat to the nature and existence of one's ongoing employment is of a similar character to the other recognized forms of adverse action—termination, refusal to hire, etc." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010) (applying an identical legal standard, a First Amendment retaliation claim in the public employment context). Dr. Lloyd's threats are an adverse action for purposes of Kessling's retaliation claim.

### Adverse Action #2—Drs. Lloyd and Larsen restricted Dr. Kessling's clinical privileges to extract teeth.

In the same meeting that Dr. Lloyd threatened Kessling's academic appointment, he also directed her to stop performing tooth extractions and restricted her privileges to do so. (Kessling Dep., ECF No. 39-1, PAGEID # 1351–56.) Before then, Dr. Kessling's responsibilities included occasionally performing uncomplicated tooth extractions. The wholesale restriction of Dr. Kessling's ability to perform procedures that fell within her job responsibilities was a material

adverse change to the terms and conditions of Dr. Kessling's employment. As such, this is an adverse action for both her discrimination and her retaliation claims.

### Adverse Action #3—Ms. Sowers and Dr. Van Putten denied Dr. Kessling additional time that she requested in the James Clinic.

Dr. Kessling complains that Ms. Sowers and Dr. Van Putten refused to increase her assignment at the James from four days per week to five. (Resp., PAGEID # 5858–60.) This not a change or disruption to her employment. There is no evidence that Dr. Kessling was ever assigned to five days at the James or that she had any reasonable expectation to a fifth day. This is not an adverse action.

### Adverse Action #4—Dr. Kessling's time at the James Clinic was cut from four days to two.

In August 2018, the University reallocated Dr. Kessling's time at the James from four days a week to two. (Resp., PAGEID # 5860–64.)

A reallocation of preexisting duties is not a material change to the terms and conditions of employment to be an adverse action for a discrimination claim. *See Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535 (6th Cir. 2002) (finding that reassignment full-time to a less convenient duty that comprised 30 to 40% of an employee's prior assignment was not an adverse action). However, a reallocation may constitute an adverse action for a retaliation claim if it has a negative effect on an employee's professional advancement or results in a loss of prestige. *See Freeman v. Potter*, 200 F. App'x 439, 444–45 (6th Cir. 2006). A loss of prestige alone may amount to a retaliatory adverse action where the new position has less

16

responsibilities, requires less training or qualifications, or lacks other unique characteristics. *Id.*

Here, the reallocation of Dr. Kessling's time between the College and the James is not an adverse action for either discrimination or retaliation. Kessling had split her time between the College and the James from the outset of her employment at OSU. She was not guaranteed any fixed allocation of days at the James in her contract. There is no evidence that the reallocation had any impact on Dr. Kessling's professional advancement or prestige—her job duties remained the same (though at a slightly different balance) and she was required to have the same training and qualifications for both assignments. In fact, the two-day assignment was only temporary, OSU added a third day at the James for Dr. Kessling after she complained.

### Adverse Action #5—Dr. Kessling was reassigned to less favorable duties within the College.

Around the same time as the reallocation of her time at the James, Dr. Kessling claims that she was assigned less favorable duties within the College— instead of overseeing the graduate prosthodontic clinic, Dr. Lloyd assigned her to the pre-doctoral student clinic. (Resp., PAGEID # 5864–65.)

This new assignment was not a material change to the terms and conditions of her employment, but a jury could find that it would deter a reasonable employee from engaging in protected conduct based on Dr. Lloyd's own belief that assignments at the graduate clinic were better than the duties at the student clinic.

17

(Lloyd Depo., ECF No. 43-4, PAGEID # 3120 ("it's a plum to get assigned to the grad clinic.").) This action is not adverse for purposes of Dr. Kessling's discrimination claim but it is for purposes of her retaliation claim.

> **Adverse Action #6—OSU did not renew Dr. Kessling's contract and she was instead offered a less favorable contract.**

While the non-renewal of an employment contract and the offer of a less favorable contract may constitute an adverse action, there is no indication that either occurred here.

Dr. Kessling first alleges that her contract was not renewed, but this is not supported by the record. Her previous employment contract was set to expire on August 31, 2018, yet she continued working through December 2019 without interruption. (Kessling Personnel File, ECF No. 51-1, PAGEID # 5073.) She stopped working because she resigned. Dr. Kessling fails to explain how this could have occurred if her contract had not been renewed and acknowledges that she had never been required to sign anything to effectuate her other contract renewals. (Resp., PAGEID # 5918.)

She also complains that she was offered a "less favorable" contract in 2018. Her primary complaint is that the offered contract was "less favorable" than her previous contract because it included a term that reduced her time at the James. However, her prior contracts did not guarantee her any amount of time at the James. (*See, e.g.,* Kessling Personnel File, ECF No. 51-1, PAGEID # 5097–98.)

The objective evidence is that the offered contract had more protection and benefits for Dr. Kessling, including an appointment to the more prestigious clinical-track faculty appointment.[4] It had a four-year term instead of the one-year term of her contracts as associated faculty. The new contract also would have made her eligible for merit-based raises. Despite her contentions to the contrary, objectively, Dr. Kessling was not offered a "less favorable" contract than her previous contracts.[5]

Dr. Kessling next argues that the new contract offered to her was "less favorable" than the contracts of Drs. Valentin and Cortes. While this argument bleeds into another element of her *prima facie* case (the requirement that she be treated differently than similarly situated comparators), it fails here because Drs. Valentin and Cortes are not appropriate comparators to make her offered contract "less favorable."

Dr. Kessling provides no evidence about why Dr. Cortes's contract terms have any bearing on the terms of the contract provided to her. As to Dr. Valentin, while she had been at the University for less time than Dr. Kessling, she was a clinical-track faculty member for her entire tenure at OSU. Dr. Valentin was hired

---

[4] There are three types of contracts for faculty at the College—associated-track, clinical-track, and tenure-track. (Lang Dep., ECF No. 45-3, PAGEID # 3910–13.) Each track came with different benefits, responsibilities, and expectations. (Lang Dep., ECF No. 45-1, PAGEID # 3717–18.)

[5] The opportunity to convert to clinical-track faculty was not unique to Dr. Kessling. At the same time, OSU offered all other full-time associated faculty in the College of Dentistry the opportunity to transition to clinical-track faculty. (Lang Dep., ECF No. 45-3, PAGEID # 3910–13.)

following a nationwide search and had more training and experience than Dr. Kessling had when she was initially hired. (Valentin Personnel File, ECF No. 51-2; Lloyd Depo., ECF No. 43-3, PAGEID # 3015.) And, unlike Dr. Kessling, OSU did not fund Dr. Valentin's fellowship. These critical differences render Kessling and Valentin incomparable—or, at a minimum, account for any differences in their pay or contracts.

A reasonable jury could not find the contract offered by OSU, which offer was made without interruption to her continued employment under the same terms that she had previously, constituted an adverse action.

### Adverse Action #7—Defendants did not assist Dr. Kessling with obtaining her board certification.

There is no evidence that OSU had any obligation to assist Dr. Kessling in obtaining board certification. By her own testimony, she understood that it was her responsibility to get board certified. (Kessling Dep., ECF No. 38-1, PAGEID # 980.) Moreover, her allegation that OSU offered no assistance is unsupported by the record—Dr. Kessling acknowledged that she was allowed to identify and treat a board qualifying patient at the College in early 2019, despite a University policy that reserved such patients for graduate students. (Kessling Dep., ECF No. 38-1, PAGEID # 1004–07.) She was also granted an additional waiver after she failed to obtain board certification during the term of her initial 5-year waiver and she had no disruption in her employment. This is not an adverse action.

20

**Adverse Action #8—Dr. Van Putten was disrespectful to Dr. Kessling.**

Kessling next complains that Van Putten repeatedly refused to speak to her, discarded some of her personal items and equipment, and put patients on her schedule without consulting her. (Resp., PAGEID # 5868–69.) This conduct, while boorish and rude, does not rise to an adverse action. As the Sixth Circuit has said:

> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simply lack of good manners will not create such deterrence.

*Szeinbach*, 493 F. App'x at 693 (quoting *Burlington*, 548 U.S. at 67–69).

**Adverse Action #9—Dr. Lloyd encouraged Dr. Van Putten to make false allegations about Dr. Kessling's competency.**
**Adverse Action #10—Ms. Sowers collected false information about Dr. Kessling.**
**Adverse Action #11— Ms. Sowers and Dr. Old demanded that she be removed from the James Clinic.**
**Adverse Action #12—Ms. Sowers and Dr. Old imposed an arbitrary deadline for Kessling to obtain her laser credentials and failed to give her help.**
**Adverse Action #13—Ms. Sowers and Dr. Old accused Dr. Kessling of misusing a laser on a patient.**
**Adverse Action #15—Ms. Sowers and Dr. Old attacked Dr. Kessling's productivity and sought to revoke accommodations given to Dr. Kessling for breastfeeding and childcare.**
**Adverse Action #16—Ms. Sowers and Dr. Old attacked Dr. Kessling for mentioning her legal rights in the workplace.**
**Adverse Action #17—Ms. Sowers and Dr. Old threatened to refer Dr. Kessling to the professionalism committee.**

21

**Adverse Action #18—Ms. Sowers accused Dr. Kessling of dishonesty and unprofessionalism.**

The Court combines adverse actions 9 through 13 and 15 through 18 because none is an adverse action for either discrimination or retaliation. False allegations, attacks, and threats fall into the category of "petty slights or minor annoyances that often take place at work" but that are not materially adverse when there is no evidence that those allegations resulted in any change in the terms of employment. *Burlington*, at 68. And, while threats may be an adverse action for purposes of a retaliation claim, the threats that Kessling alleges here are not the type that are actionable—not only were Sowers and Old not her supervisors, Kessling provides no evidence that she was ever referred to the professionalism committee, that any false information was put in her personnel file, that there were any threats to the nature and existence of her on-going employment, or that she was even aware of many of these conversations prior to discovery in this lawsuit.

As for Dr. Kessling's claim that Dr. Lloyd "encouraged" Dr. Van Putten to make false allegations, there is nothing in what she overheard that could reasonably be interpreted as Dr. Lloyd encouraging Van Putten to make false allegations. (*See* Kessling Dep., ECF No. 38-1, PAGEID # 958 ("[Dr. Lloyd] requested [that] Dr. Van Putten gather information on [Dr. Kessling] and give it directly to him.").)

22

**Adverse Action #14—Ms. Sowers imposed a punitive scheduling template on Dr. Kessling.**

Kessling says that in January 2019, after she was put back to three days at the James, Sowers imposed a new and punitive scheduling template for her assignments at the James. (Resp., PAGEID # 5881–88.)

A maxillofacial prosthodontist's scheduling template had four types of appointments: dental clearances, laser cases, intraoral prosthetic cases, and extraoral (or "facial") prosthetic cases. (Sowers Dep., ECF No. 42-2, PAGEID # 2298–2302.) According to Kessling, her new January 2019 template was an adverse action because, among other things, her template had too many dental clearance slots and not enough time allocated to each slot. (Resp., PAGEID # 5883–86.) Because there were more dental clearance slots than dental clearance patients, the template resulted in excessive vacancies, which impacted her productivity. And because there was not enough time to complete each dental clearance appointment, the template resulted in overcrowding her at times, which put her at risk for violating the standard of care for her patients.

Dr. Kessling has not demonstrated that her new template was more than a temporary inconvenience due to shifting operations or matters of personal preference. For example, while she claims that she had more dental clearances than her prior templates and the templates of Drs. Valentin and Van Putten, there is no evidence that these appointments were less prestigious or more arduous than other types of appointments, that she was assigned more <u>total</u> appointments than the

other maxillofacial prosthodontists, or that she was given less time to complete her dental clearance appointments than her colleagues. In fact, Dr. Kessling refused to take more than one new facial case per week and OSU tried to accommodate that refusal. (Kessling Email, ECF No. 51-15, PAGEID # 5380.)

The other problem with Dr. Kessling's complaints about the template is that she was not able to perform all of the same types of appointments as her colleagues for the four months that she did not have her laser certification—her template was changed again when she obtained the certification. (Kessling Decl., ECF No. 61-2, PAGEID # 6028.) This and her self-imposed limitation on facial cases limited the type of appointments (other than dental clearances) that could be on Kessling's template during the four months it was in place. This is not an adverse action.

> **Adverse Action #19—Dr. Van Putten downgraded his assessment of Dr. Kessling's clinical skills in her credentialing application and delayed her recertification to perform laser procedures.**

Generally, performance evaluations that have no negative effect on wages or professional advancement are not retaliatory adverse actions. *See, e.g.*, *Halfacre v. Home Depot*, U.S.A., Inc., 221 F. App'x 424, 433 (6th Cir. 2007). Dr. Kessling has not demonstrated that Dr. Van Putten's performance evaluation had any negative effect on her salary or professional advancement. Further, Dr. Van Putten did sign off on her laser credentialing and she was then able to perform laser procedures. As such, these actions did not constitute an adverse action.

### Adverse Action #20—Dr. Larsen interfered with Dr. Kessling's credentialing renewal.

To maintain her credentials at the James, Dr. Kessling had to be board certified or have a valid waiver of the certification requirement. In 2018, Dr. Kessling needed to apply for a second waiver because her initial 5-year waiver was about to expire and she was not board certified. (Kessling Dep., ECF No. 38-1, PAGEID # 976.). Although she requested a three-year waiver, the credentialing board initially approved only a six-month waiver; following another application, the board approved an additional twelve-month waiver. While Dr. Kessling was able to continue practicing under her waivers, she complains that Dr. Larsen interfered with her attempts to secure the additional waivers. (Resp., PAGEID # 5897–60.) There is no dispute that Dr. Larsen initially recommended that Dr. Kessling's waiver request be denied before reversing course and recommending approval of her request. (*Id.*)

Intermediate and inconsequential recommendations—particularly in an academic setting—are not adverse actions. *See Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014); *see also Kubik v. Cent. Mich. Univ. Bd. of Trustees*, 717 F. App'x 577, 583 (6th Cir. 2017) (explaining that, generally, actions that are quickly rescinded or does not cause harm do not constitute adverse actions) (collecting cases). Accordingly, this is not an adverse action.

### b.    Direct Evidence

Direct evidence is evidence that, if believed, requires the conclusion that retaliation was at least a motivating factor in the employer's actions. *See McGee v. Food Warming Equip., Inc.*, No. 3-14-CV-01776, 2017 WL 587856, at *2 (M.D. Tenn. Feb. 14, 2017). Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to retaliate against the employee—it does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by discrimination or retaliation. *See Equal Emp. Opportunity Comm'n v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 697–98 (M.D. Tenn. 2020). Importantly, the evidence must establish not only that the plaintiff's employer was predisposed to retaliate, but also that the employer acted on that predisposition. *Id.*

"Where a plaintiff has shown direct evidence of retaliation, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Grizzard v. Nashville Hosp. Capital, LLC*, 2021 WL 3269955, at *20 (M.D. Tenn. July 30, 2021) (internal citations and quotations omitted); *see also Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707–712 (6th Cir. 1985). "In the summary judgment—as opposed to trial— context, the defendant-movant must show that *no reasonable jury* could fail to find by a preponderance that the defendant would have made the same decision absent the impermissible (here, retaliatory) motive." *Grizzard*, at *20.

26

Dr. Kessling argues that she has submitted direct evidence of retaliation by Lloyd, Van Putten, Sowers, and Old. However, as discussed above, the actions of Van Putten, Sowers, and Old do not rise to the level of adverse employment actions. That leaves the alleged retaliation by Dr. Lloyd.

Dr. Lloyd's statements to Dr. Kessling are direct evidence of retaliation. They do not require the drawing of inferences to reach the conclusion that he wished to retaliate against Dr. Kessling for her participation in the investigation against Van Putten. He told Dr. Kessling that he was disappointed in what she had shared in the investigation and that she had been disrespectful to a senior faculty member. (Kessling Decl., ECF No. 61-2, PAGEID # 6006–07.) He instructed her to share her complaints about Dr. Van Putten only with Dr. Lang in the future. (Kessling Dep. ECF No. 38-2, PAGEID # 1079–80.) Dr. Lloyd then reminded Dr. Kessling that he had the power to withdraw her academic appointment (which would result in her termination) and that he would do so if she did not follow his directives. (Kessling Dep. ECF No. 38-1, PAGEID # 969; Kessling Decl., ECF No. 61-2, PAGEID # 6006–07.) While Dr. Lloyd disputes what was said at the meeting, if a factfinder were to believe Dr. Kessling's testimony, Dr. Lloyd's statements require a conclusion that retaliation was at least a part of his motivation for his actions toward her.

Because Kessling has presented direct evidence of retaliation, the Court can grant summary judgment to OSU only if it has shown that no reasonable jury could fail to find by a preponderance of the evidence that Lloyd would have taken the same actions absent a retaliatory motive. It has not.

27

OSU claims that the conversation between Lloyd and Kessling was not about her participation in the March investigation, but rather was the result of complaints made about Dr. Kessling performing extractions beyond the scope of her permissions. However, given the timing and Dr. Kessling's version of their conversation, a reasonable jury could choose to believe Dr. Kessling's version of events, finding that Dr. Lloyd had a retaliatory motivation.

Because Dr. Kessling has established her retaliation claim based on direct evidence, the Court need not address whether she has met all elements of her *prima facie* case under the *McDonnell Douglas* framework—including whether all twenty actions collectively constituted retaliatory harassment. OSU is not entitled to summary judgment on Dr. Kessling's Title VII retaliation claim.

### c.    Indirect Evidence

Dr. Kessling has not presented direct evidence of discrimination, so the Court must use the *McDonnell Douglas* framework for her discrimination claim. Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case. A *prima facie* case of discrimination requires a showing that the plaintiff: (1) is a member of a protected class, (2) was qualified for her job, (3) suffered an adverse employment decision, and (4) was replaced by a person outside the protected class or treated differently than similarly situated nonprotected employees. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).  There are two discriminatory adverse actions—pay disparity and the restriction of Kessling's privileges.

28

When a plaintiff establishes a *prima facie* case, it creates a rebuttable presumption that the employer engaged in unlawful conduct and the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 252–53. This burden is not onerous; an employer satisfies its burden if it articulates a valid rationale for its decision. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). If a defendant presents a legitimate, non-retaliatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a genuine issue of material fact as to whether the proffered reason is in fact a pretext for" unlawful discrimination. *Walcott v. City of Cleveland*, 123 F. App'x 171, 176 (6th Cir. 2005). The ultimate burden of persuasion remains on the plaintiff throughout this analysis. *See Burdine*, 450 U.S. at 253–56.

To demonstrate pretext, Dr. Kessling may establish that the proffered reasons: (1) had no basis in fact, (2) did not actually motivate the action, or (3) were insufficient to motivate the action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). But plaintiffs are not limited to presenting evidence that falls cleanly within these categories. Rather, they are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.*.

A jury "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods.,*

29

*Inc.*, 263 F.3d 595, 600 (6th Cir. 2001) (quotation and citation omitted). Accordingly, to avoid summary judgment, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it [acted as it did]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### i.    Disparate Treatment compared to Van Putten.

Dr. Kessling complains that she was paid less than Van Putten and was otherwise subject to less favorable treatment as compared to him. (Resp., PAGEID # 5836, 5953–5956.) In response, OSU argues that Dr. Kessling cannot establish a *prima facie* case of discrimination using Dr. Van Putten as a comparator because he was not a similarly situated nonprotected employee.

To demonstrate that Van Putten is "similarly situated" Dr. Kessling "need not demonstrate an exact correlation with the employee receiving more favorable treatment"; rather they must be similar in "all relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994)). In determining relevance, courts are to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and the comparator employee." *Id*; *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) (finding that relevant aspects of employment may include having the same supervisor, being subject to the same standards, and engaging the same conduct).

Here, Kessling and Van Putten were not similarly situated in all relevant

30

aspects. It is undisputed that Van Putten has decades more experience as a maxillofacial prosthodontist at OSU than Dr. Kessling—he worked at the College of Dentistry for over 20 years and worked at the James Clinic full-time for over a decade. (Van Putten Personnel File, ECF No. 51-3.) Van Putten had previously served as Chair of the Section of Primary Care within the College of Dentistry. (*Id.*) During his nearly 30-year career, he has lectured both nationally and internationally and has written multiple research papers and abstracts. (*Id.*) As a tenured faculty member, Van Putten was not required to teach, was subject to greater research and publication requirements, and was eligible for merit-based raises on top of annual salary increases.

In contrast, Dr. Kessling was at the University for only five years, she held no leadership positions at the College, and was not tenured. Dr. Kessling was not subject to the same research and publication requirements as Dr. Van Putten. Thus, while they may have been peers in some respects with the same supervisor and performing many of the same functions, their differences in tenure, rank, and scholarship matter in a university setting.

The differences between Drs. Van Putten and Kessling are also legitimate, nondiscriminatory reasons for the differences in their treatment. She has not demonstrated that any of these reasons are pretextual. Thus, she has failed to state a claim for unlawful discrimination based on disparities in pay or treatment with Van Putten.

### ii. Lloyd and Larsen restricted Kessling's clinical privileges to extract teeth.

As to the adverse action that occurred when Drs. Lloyd and Larsen restricted her privileges to extract teeth, Dr. Kessling has not identified a comparator for whom there were similar concerns about extractions beyond the scope of their responsibilities that was treated differently.

Even if she had established the elements of her *prima face* case, OSU provides a legitimate, non-discriminatory reason for restricting her privileges—that it was necessary to do so to address concerns that she was performing tooth extractions beyond the scope of her responsibilities. Now the burden shifts to Dr. Kessling to demonstrate that this reason was pretextual.

Dr. Kessling argues that Drs. Lloyd and Larsen provide contradictory testimony for how they learned about issues with her tooth extractions. In fact, both Drs. Lloyd and Larsen testified that they were independently alerted to potential issues with Dr. Kessling's extractions by individuals who worked with Dr. Kessling at the James Clinic. (Lloyd Dep., ECF No. 43-1, PAGEID # 2875; Larsen Dep. ECF No. 40-2, PAGEID # 1539–40, 53–54.) Although their testimony varied slightly on whether Dr. Larsen conducted a review of Kessling's credentials independently or at Lloyd's direction, this is of little consequence because both Defendants agree that Dr. Larsen conducted such a review. (Lloyd Depo, ECF Nos. 43-1, 43-2, PAGEID # 2875–76, 2884; Larsen ECF No. 40-2, PAGEID # 1568–70.) After Dr. Larsen concluded that Dr. Kessling had been performing extractions beyond the scope of

her responsibilities, Dr. Lloyd told Dr. Kessling to stop performing extractions. (Larsen ECF No. 40-2, PAGEID # 1568–70; Lloyd Dep., ECF No. 2897.) This does not support an argument of pretext for discrimination.

Kessling also attempts to demonstrate pretext by arguing that OSU's proffered reason had no basis in fact, arguing that she was not performing improper extractions and only performed extractions at the request of oncologists. (Resp., PAGEID # 5855; Kessling Decl., ECF No. 61-2, PAGEID # 6005.) However, the oncologists had no training in dentistry or experience in determining whether a given procedure fell within the scope of her privileges. (Lloyd Dep., ECF 43-2, PAGEID # 2881.) It is undisputed that it was Kessling's responsibility to use her judgment as to whether an extraction was within her credentials. Based on the information from Dr. Larsen and other sources, Dr. Lloyd did not believe Dr. Kessling exhibited sound judgment in making such determinations. (Lloyd Depo, ECF No. 43-2, PAGEID # 2893–97.) Dr. Kessling has not demonstrated that the concerns about her performing extractions beyond her responsibilities had no basis in fact.

Because she has failed to establish a *prima facie* case of sex discrimination and has not demonstrated that OSU's proffered reasons were mere pretext for discrimination, Dr. Kessling's discrimination claim fails as a matter of law.

Defendants' Motion for Summary Judgment is **GRANTED** on Dr. Kessling's Title VII discrimination claim.

33

## 2.  Constructive Discharge

A constructive discharge occurs when working conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). Constructive discharge is hard to prove. *See Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018). To demonstrate a constructive discharge, the plaintiff must show that: (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit. *See Savage v. Gee,* 665 F.3d 732, 739 (6th Cir. 2012). The Sixth Circuit employs a multi-factor approach to determine whether intolerable working conditions existed, including examining the presence of: (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (6) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan v. Denny's, Inc.,* 259 F.3d 558, 569 (6th Cir. 2001). Also relevant is "the employer's intent and the reasonably foreseeable impact of its conduct on the employee." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1249 (6th Cir. 1989) (quotation omitted).

Dr. Kessling's constructive discharge claim fails. Most of the things she complains about were not changes to her employment. Even to the extent there were some changes, none of them created working conditions that a reasonable

person would have found to be intolerable. For example, Dr. Kessling's reduction of time at the James had no impact on her pay, hours, job responsibilities, or even the type of work that she performed.

Additionally, none of Kessling's complaints constitutes badgering, harassment, or humiliation by her employer. Instead, she recounts petty slights or minor annoyances from her coworkers; she was not even aware of many of the incidents until discovery in this suit. These are not the type of working conditions that are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Logan*, at 887 (internal quotation marks omitted).

No matter how she subjectively reacted to her situation, there is no evidence that OSU intended to force her to resign or that her resignation was a reasonably foreseeable impact of its conduct—especially given that OSU had offered her a four-year contract and a twelve-month credentialling waiver before her resignation.

Finally, according to her own testimony, she was not looking for a new job and had no intention of leaving the University before the VA solicited her for a job. (Kessling Dep., ECF No. 38-3, PAGEID # 205, 207–208.)

Defendants' Motion for Summary Judgment on Dr. Kessling's constructive discharge claim is **GRANTED**.

### 3. *Faragher/Ellerth* Defense

As an additional basis for summary judgment on Dr. Kessling's Title VII claim, OSU argues that it is not liable under the *Faragher/Ellerth* defense. Because

Dr. Kessling's retaliation claim is the only claim that survives, the Court focuses its discussion that claim.

In order to avoid vicarious liability for non-tangible employment actions taken by a supervisor, the *Faragher/Ellerth* defense requires an employer to establish two elements by a preponderance of the evidence: 1) that it exercised reasonable care to prevent and promptly correct retaliatory harassment; and 2) that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. *See Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000).

There is a genuine issue of material fact as to whether Dr. Kessling failed to take advantage of OSU's available procedures. OSU claims that Dr. Kessling refused to share information about instances of retaliation that occurred after she participated in the March 2018 investigation and that she asked OSU not to investigate these matters. However, Kristi Hoge acknowledged that during her interview of Dr. Kessling in November 2018, Dr. Kessling reported that Dr. Lloyd told her "that he was very disappointed that [she] did not respect senior faculty member" and that she believed she had been retaliated against. (Hoge Dep. ECF No. 46-2, PAGEID # 4352.) Although Dr. Kessling told Ms. Hoge not to investigate, she also told Ms. Hoge that she wanted OSU's legal department to perform the investigation. (Kessling Decl., ECF No. 61-2, PAGEID # 6010.)

Even if OSU could establish that Dr. Kessling failed to take advantage of available procedures, there is still a genuine issue of material fact as to whether

36

any such failure would be unreasonable—a reasonable jury could find that an employee who was under a credible threat of retaliation had no duty to take advantage of an employer's available procedures. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 416 (6th Cir. 2021). Dr. Kessling has presented direct evidence that Dr. Lloyd threatened her employment after she complained about Dr. Van Putten in March, and this is enough to create a jury question as to whether she had a rational fear of retaliation if she made more complaints.

Viewing the record in the light most favorable to Dr. Kessling, a jury could reasonably find that she did not unreasonably fail to take advantage of OSU's available procedures. OSU's *Faragher/Ellerth* defense argument fails.

### D. Title IX Claim

Title IX prohibits discrimination based on sex and pregnancy by "any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a); *see also Workman v. Univ. Of Akron*, 2017 U.S. Dist. LEXIS 203302, *6 (N.D. Ohio) ("The discrimination prohibited by Title IX includes discrimination related to pregnancy."); 34 CFR § 106.57(b). Though the statute contains no express private right of action, the Supreme Court has held that individuals may sue funding recipients for violating Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 717, (1979); *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 76 (1992). This implied right of action includes claims of retaliation against those who complain about sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

Title IX claims are subject to the same legal standards as Title VII claims. *See Nelson v. Christian Bros. Univ.*, 226 Fed. Appx. 448, 454 (6th Cir. 2007) (Title IX and Title VII claims are analyzed under the same legal standards for both discrimination and retaliation) (collecting cases). *See Bose v. Bea*, 947 F.3d 983, 989–90 (6th Cir. 2020), *cert. denied*, 208 L. Ed. 2d 521 (2021) (the elements of *prima facie* retaliation claims under Title VII and Title IX are analogous). However, there is a critical difference in the type of conduct that can be imputed to an employer under Title VII and a funding recipient under Title IX: whereas employers can be held liable for the unlawful conduct of their employees under Title VII, a funding recipient is only liable for its own misconduct under Title IX. *Bose*, at 989–90 ("Title IX imposed liability only for a funding recipient's 'own official decision[s]' and not 'for its employees' independent actions.") (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)).

Thus, Dr. Kessling's Title IX discrimination claim fails for the same reasons that her Title VII discrimination claim failed. As to her Title IX retaliation claim, there is a genuine dispute whether Dr. Lloyd threatened to withdraw her academic appointment and took other actions as retaliation for her participation in the March investigation. As the Dean of the College of Dentistry, Dr. Lloyd had the authority to withdraw Dr. Kessling's academic appointment. This threat by the Dean is OSU's own official decision and is sufficient for OSU to be liable under Title IX . *See, e.g.*, *Bose*, at 991–92 (explaining that acting or failing to act by a high-ranking university

38

official in their official capacity is a university's own official decision) (citing *Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81 (2d Cir. 2011)).

Defendants' Motion for Summary Judgment is **DENIED** on Dr. Kessling's Title IX retaliation claim and **GRANTED** on her Title IX discrimination claim.

### E.    Section 1983 Claims

Dr. Kessling's claims against the individual Defendants are brought against them in their individual and official capacities. She alleges that the individual Defendants retaliated against her for her protected speech in violation of the First Amendment and that they discriminated against her in violation of the Equal Protection Clause of the Fourteenth Amendment.

As a preliminary matter, Kessling is not permitted to bring § 1983 claims against Defendants in their official capacity. Section 1983 imposes liability only upon a "person" who, under color of law, subjects another person to a deprivation of federal rights, and State officials acting in their official capacity are not "persons" under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Gean v. Hattaway*, 330 F.3d 758, 766 (6th Cir. 2003) (holding that § 1983 claims against agents of the state in their official capacity are not cognizable).

To succeed on her § 1983 claim against Defendants in their individual capacities, Dr. Kessling must demonstrate personal involvement of each Defendant in causing her injury. *Hardin v. Straub*, 954 F.2d 1193, 1196 (6th Cir. 1992). A person cannot be held liable under § 1983 unless he or she personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly

unconstitutional conduct. *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1241 (6th Cir. 1989). A plaintiff must demonstrate that a supervisory defendant "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on," *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999), because "[§] 1983 liability cannot be imposed under a theory of *respondeat superior.*" *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (citation omitted).

Thus, to establish liability against an individual defendant, Kessling must plead and prove that the defendant was personally involved in the conduct that forms the basis of her complaint. *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002); *Breen v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) (stating that, "[a]t a minimum a [§ 1983] plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct").

Before addressing the merits of Kessling's § 1983 claims, the Court will address the claim against Dr. Old. Then, the Court will turn to the First Amendment retaliation claim before finishing with Kessling's Equal Protection claim.

### 1. Dr. Old

Kessling does not make any factual allegations against Dr. Old in her Complaint. She presents allegations against him for the first time in her response to the Defendants' motion for summary judgment. Parties who seek to raise new claims at the summary-judgment stage must first move to amend their pleadings

40

under Federal Rule of Civil Procedure 15(a). *See Rafferty v. Trumbull Cnty.*, 758 F. App'x 425, 429 (6th Cir. 2018). If the plaintiff seeks to raise new claims for the first time in response to summary judgment, a district court does not err by refusing to consider them. *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005).

Kessling has not moved to amend her complaint to include allegations against Dr. Old.[6] The Court will not consider claims brought against him for the first time in summary judgment briefing. Defendants' Motion for Summary Judgment is **GRANTED** as to Defendant Matthew Old.

### 2.    First Amendment Claim

It is well settled that "a public employer may not retaliate against an employee for her exercise of constitutionally protected speech." *Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019); *see also See v. City of Elyria*, 502 F.3d

---

[6] In her response to Defendants' summary judgment motion, Kessling asks for leave to amend the complaint "in the event that the Court peruses the complaint and determines it is deficient." (Resp., PAGEID # 5945.) This open-ended request for an advisory opinion on the deficiencies of her complaint is not a proper motion to amend. *See Begala v. PNC Bank*, 214 F.3d 776, 784 (6th Cir. 2000) (affirming District Court's determination that "*Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint* and then an opportunity to cure those deficiencies.") (emphasis in original).

484, 495 (6th Cir. 2007) ("a public employee's right to speak on matters of public concern without facing improper government retaliation [is] settled").[7]

First Amendment retaliation claims are also subject to a burden-shifting framework. *Haji v. Columbus City Sch.*, 621 Fed.Appx. 309, 314 (6th Cir.2015). To succeed on a claim against her employer, a public employee must first make *prima facie* case of retaliation, which is comprised of the following elements: (1) that her speech was protected, (2) that her employer took an adverse action against her, and (3) that her protected speech was a substantial or motivating factor for the adverse action—that is, the adverse action was motivated at least in part by her protected conduct. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir.2006); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir.2012). If the employee establishes a *prima facie* case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that it would have taken the same actions absent the protected conduct. *Dye*, 294–95. Once this shift has occurred, summary judgment in favor of the employer is warranted only if, considering the evidence viewed in the light most favorable to the employee, no reasonable juror could return a verdict for the employee. *Id.*

---

[7] In fact, it is so well settled that Defendants' argument for qualified immunity deserves no more than a footnote: the individual Defendants are not entitled to qualified immunity.

***Protected Speech***. There is a three-step inquiry to determine whether speech by a public employee is constitutionally protected. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). A plaintiff must show that (1) she spoke as a private citizen, (2) on a matter of public concern, and (3) that the interest of the government employer in promoting efficient public service is not outweighed by her interest in that speech. *Id.*; *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). Defendants contend that Dr. Kessling was not speaking as a private citizen when she participated in internal investigations into sex discrimination and retaliation.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti*, at 421. Restricting such speech, "does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, at 411. The critical question is whether the speech "owes its existence to a public employee's official responsibilities." *Id.* However, employers may not restrict the rights of their employees by imposing overly broad job descriptions. *Id.* at 424–25. Instead, the inquiry is a practical one that looks at routine job functions or *ad hoc* duties that the employee is actually expected to perform. *Id.*; *see also Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543 (6th Cir. 2007) (finding speech was pursuant to official duties where employee was "obligated" to participate in an investigation about employee morale and performance was an *ad hoc* duty); *c.f.*

*Buddenberg*, at 740 (employee acted as a private citizen when she brought complaints of discrimination and misconduct outside her chain of command and of her own volition).

Here, Dr. Kessling was not speaking pursuant to her official duties when she voluntarily participated in internal investigations. There is no evidence that her day-to-day responsibilities included reporting instances of workplace discrimination or harassment, that she was required to participate in the investigations, or that she would suffer disciplinary action for failing to participate. Defendants argue that a University policy provides that employees have a "responsibility" to report discrimination. (*See* University Policy, ECF No. 38–5, PAGEID # 1272–75.) But that policy provides only that University employees can report discrimination "if desired" or "if comfortable doing so." (*Id.*) This did not create an obligation to report discrimination.

Kessling's statements made during both internal investigations were made as a private citizen and are protected under the First Amendment.

***Adverse Action***. The First Amendment standard for an adverse action in the public employment context is identical to the standard for a Title VII retaliation claim—it is an adverse action if it "'might have dissuaded a reasonable worker' from engaging in protected activity." *Benison*, 765 F.3d at 659 (quoting *Burlington*, 548 U.S. at 68). Dr. Kessling has established the following retaliatory adverse actions: (1) the threat to withdraw her academic appointment, (2) the restriction of her extraction privileges, and (3) the reassignment of her duties within the College.

44

Because these are the only adverse actions for purposes of Dr. Kessling's First Amendment claim, OSU's Motion for Summary Judgment is **GRANTED** as to Dr. Van Putten and Ms. Sowers.

***Protected speech was a substantial or motivating factor***. Dr. Kessling must show that her protected speech was a "substantial or motivating factor" in the adverse actions taken against her. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Dye*, at 305–06 (finding that a temporal proximity of two months is sufficient). The Court can also consider "incidents of misconduct that do not rise to the level of an adverse employment action if those incidents show a pattern of mistreatment on the job based on plaintiff's protected activities." *Benison*, at 661 (internal quotations and citation omitted).

### a.    Defendant Patrick Lloyd

Kessling has established a *prima facie* case of First Amendment retaliation against Dr. Lloyd by presenting evidence that, within weeks of learning about her participation in the March investigation, Dr. Lloyd threatened to withdraw her academic appointment and restricted her clinical privileges to perform extractions; within months, he reassigned her to duties within the College to those that he believed were less "plum."

Having established a *prima facie* case of retaliation, the burden shifts to Defendants to demonstrate that no reasonable jury could return a verdict for Dr. Kessling. They have failed to do so.

Although Defendants argue that the threat to withdraw Kessling's academic appointment and restriction of her extraction privileges were necessary to address concerns about her performing extractions beyond the scope of her responsibilities, that argument is best resolved by a jury—Dr. Lloyd's comments at the time he took these actions could cause a reasonable jury to conclude that his motive was, at least in part, retaliation. Similarly, a reasonable jury could choose not to credit Defendants' vague argument that Kessling's duties within the College were reassigned to "meet the needs of the College." A reasonable jury could conclude that Dr. Lloyd was motivated, at least in part, by Dr. Kessling's protected conduct.

OSU's motion for summary judgment is **DENIED** as to Dr. Lloyd in his individual capacity.

### b.    Defendant Peter Larsen

Dr. Kessling has failed to establish a *prima facie* case against Dr. Larsen. Although she alleges that he was involved in revoking her privileges to perform extractions, there is no evidence that Dr. Larsen was aware of Kessling's protected activities when that action was taken. Thus, she cannot prove that his involvement was motivated by her protected activity. Kessling's First Amendment retaliation claim against Dr. Larsen fails as a matter of law.

OSU's motion for summary judgment is **GRANTED** as to Dr. Larsen.

### 3. Fourteenth Amendment Claim

Dr. Kessling alleges that the individual Defendants violated her right to equal protection. (Resp., PAGEID # 5960.) The elements for establishing an equal protection claim under § 1983 and the elements for establishing a discrimination claim under Title VII are the same. *See Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 917–18 (6th Cir. 2014). Because Dr. Kessling has failed to establish a *prima facie* case of discrimination under Title VII, the claim also fails under the Fourteenth Amendment.

Defendants' Motion for Summary Judgment is **GRANTED** on Dr. Kessling's Fourteenth Amendment claim.

## IV. Conclusion

For the reasons stated herein, Plaintiff's Motion to Strike and for Leave to File a Sur-reply (ECF No. 69) is **DENIED**. Defendants' Motion for Summary Judgment (ECF No. 51) is **GRANTED** in part and **DENIED** in part. Remaining for trial are Dr. Kessling's retaliation claims under Title VII and Title IX against the University and her First Amendment retaliation claim against Dr. Lloyd in his individual capacity.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**